TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00005-CV






Osage Environmental, Inc., Appellant


v.


Railroad Commission of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT

NO. D-1-GN-05-004551, HONORABLE DARLENE BYRNE, JUDGE PRESIDING




M E M O R A N D U M O P I N I O N



 This appeal concerns a suit for judicial review of a final order issued by appellee
Railroad Commission of Texas finding that appellant Osage Environmental, Inc., violated its permit
to handle oil and gas waste, Commission Statewide Rules 8 ("Rule 8") and 78 ("Rule 78"), (1) and
statutes authorizing the Commission to regulate oil and gas waste. The district court affirmed
the Commission's order, and Osage appeals. In five issues, Osage challenges the Commission's
authority to require Osage to obtain a permit and the Commission's interpretation and application
of its rules. Because we conclude that the Commission's final order was consistent with the statutes
and rules authorizing the Commission to regulate oil and gas waste and that the Commission's final
order was supported by substantial evidence, we affirm the district court's judgment affirming the
Commission's final order.


BACKGROUND


 As an oilfield waste hauler, John P. "Pat" Rozypal, president of Osage, contracted
with oilfield operators to dispose of cuttings and other oilfield waste. In July 2000, an inspection
by the Commission's district office revealed that Osage was receiving and storing oilfield waste
consisting primarily of oil-based drill cuttings. (2) The testimony showed that Rozypal sometimes
hauled the cuttings to an authorized disposal facility but, at other times, Rozypal would take the
cuttings to the "Rozypal Ranch Facility" in Jim Wells County where Osage would stockpile it,
hoping to recycle it into road base to sell to paving contractors.

 When Rozypal first contacted the Commission in 1999 to ask if Osage needed
to obtain a permit from the Railroad Commission, the Commission told him that Osage did not
need a permit. In a letter dated September 3, 1999, the Commission explained that it was returning
Rozypal's application because it understood that Osage had registered with the Texas Commission
on Environmental Quality ("TCEQ"), formerly known as the Texas Natural Resources Conservation
Commission ("TNRCC"), as a waste recycling facility under Title 30, Chapter 335 of the Texas
Administrative Code. See 30 Tex. Admin. Code §§ 335.1-.594 (2008) (TCEQ). Upon further
consideration, the Commission determined that, in fact, Rule 8 required Osage to obtain a permit
to "store and process waste and re-use processed material as road base." See 16 Tex. Admin. Code
§ 3.8 (2008). The Commission notified Osage that a permit was required in a letter dated July 31,
2000, and requested Osage to file a completed permit application on or before August 31, 2000.

 On August 28, 2000, Rozypal sent a letter to the Commission's Environmental
Services Division on behalf of Osage requesting "a letter of authority and or recycling permit
for certain types of oilfield waste subject to the jurisdiction of the [Commission]." Although some
negotiations occurred between Osage and the Commission, in a letter dated December 19, 2000, the
Commission denied Osage's application based on numerous deficiencies. This letter also advised
Osage of its right to request a hearing. Without requesting a hearing, Osage filed suit against the
Commission in a Travis County district court. By its suit, Osage sought a declaration on whether
the Commission properly applied Rule 8 to require Osage to obtain a permit. While this suit was
pending, Osage continued to negotiate the terms of a permit with Commission staff. Osage also
continued to receive oilfield waste at the Rozypal Ranch Facility.

 In June 2003, Osage and the Commission reached an agreement on the permit terms. 
Osage also agreed to reduce its stockpile of waste to 10,000 cubic yards, to file required reports
with the Commission, and to file financial security with the Commission as required by Rule 78. 
See 16 Tex. Admin. Code § 3.78 (2008); see also Tex. Nat. Res. Code Ann. § 91.109 (West Supp.
2007). Based on these agreements, the Commission issued permit number STF-011 to Osage on
June 26, 2003, and Osage dismissed its lawsuit against the Commission.

 Shortly thereafter, an inspection revealed that Osage had breached the agreement
to reduce its stockpile of waste. The inspection found that instead of reducing its stockpile of
waste, Osage had continued to receive even more waste. Moreover, Osage had not filed the required
financial security with the Commission. See 16 Tex. Admin. Code § 3.78. In response to
Commission demands, Osage submitted a timeline for compliance with the terms of its permit. But
Osage failed to meet its own timeline, and the Commission initiated administrative enforcement
proceedings against Osage for violating the terms of its permit.

 Osage again filed suit against the Commission and sought to enjoin the enforcement
proceedings because Osage, as a recycler, was not subject to Commission regulation under Rule 8. 
After a temporary injunction hearing, the district court signed an agreed order that abated
the enforcement proceedings until November 18, 2004, subject to Osage filing financial security
with the Commission on or before August 6, 2004, and completing the necessary permit
requirements to demonstrate the feasibility of recycling oilfield waste into quality road base material
by November 3, 2004. The agreed order also provided that Osage could resume commercial
operations in accordance with the terms of its permit once the Commission approved the financial
security filed by Osage.

 Osage filed the required security with the Commission in the form of a $500,000
bond on August 24, 2004. Although the Commission approved the bond filed by Osage, Osage
did not fulfill the necessary permit requirements as specified in the agreed order. An inspection of
the Rozypal Ranch Facility on January 14, 2005, showed that Osage had not reduced its stockpile
of waste to the 10,000 cubic yards covered by its bond and that Osage was storing approximately
48,750 cubic yards of waste. A follow-up inspection two months later showed that the amount of
stockpiled, unprocessed waste at the Rozypal Ranch Facility had grown to approximately 62,455
cubic yards.

 Based on Osage's continued noncompliance, the Commission resumed its
enforcement proceedings against Osage. The Commission held a hearing on Osage's alleged permit
and rule violations in May 2005, which resulted in a final order imposing administrative penalties
of $40,000 against Osage for violations of its permit and Commission rules. The Commission
denied Osage's motion for rehearing on November 29, 2005. Osage then filed a third lawsuit
seeking judicial review of the Commission's final order. The district court affirmed the
Commission's order in all respects, and this appeal followed.


DISCUSSION


 The primary issue before us is whether Osage, as a purported waste recycler,
must comply with Rule 8. See 16 Tex. Admin. Code § 3.8. The record reveals a fundamental
disagreement between Osage and the Commission about whether the ongoing recycling activities
at the Rozypal Ranch Facility are subject to regulation by the Commission under Rule 8. In five
issues, Osage challenges the Commission's regulatory authority under Rule 8 as well as its findings
and conclusions that Osage was required to obtain a permit in the first instance and that Osage
violated the permit issued by the Commission in 2003.


Standard of Review

 We review the Commission's final order under the substantial evidence rule. See
Tex. Nat. Res. Code Ann. § 85.241 (West 2001); Tex. Gov't Code Ann. § 2001.174 (West 2000); 

Railroad Comm'n v. Pend Oreille Oil & Gas Co., 817 S.W.2d 36, 40 (Tex. 1991). Because our
examination of the Commission's final order involves the interpretation of an administrative
rule, "we employ well-settled principles of statutory construction." Continental Cas. Co. v. Rivera,
124 S.W.3d 705, 710 (Tex. App.--Austin 2003, pet. denied); see Lewis v. Jacksonville Bldg. & Loan
Ass'n, 540 S.W.2d 307, 310 (Tex. 1976). We review questions of statutory construction de novo. 
Texas Dep't of Transp. v. Needham, 82 S.W.3d 314, 318 (Tex. 2002); Bragg v. Edwards Aquifer
Auth., 71 S.W.3d 729, 734 (Tex. 2002). When ascertaining the scope of an agency's authority,
we give great weight to the agency's construction of a statute it is charged with enforcing. State
v. Public Util. Comm'n, 883 S.W.2d 190, 196 (Tex. 1994). We also recognize that an administrative
agency has the power to interpret its own rules, and its interpretation is entitled to great weight
and deference. Gulf States Utils. Co. v. Public Util. Comm'n, 784 S.W.2d 519, 527 n.5
(Tex. App.--Austin 1990), aff'd, 809 S.W.2d 201, 207 (Tex. 1991) (citing Udall v. Tallman,
380 U.S. 1, 16 (1965)). An agency's construction of its rules is controlling unless it is plainly
erroneous or inconsistent with the text of the rule. Rivera, 124 S.W.3d at 710; Gulf States Utils. Co.,
784 S.W.2d at 528. As a reviewing court, we may not view a part of the rule in isolation. Rivera,
124 S.W.3d at 710. We must consider the rule as a whole, and we must also ensure that the agency
has interpreted its rule in harmony with its enabling statute. Id.


Commission Enforcement Authority

 In its first two issues, Osage challenges the district court's judgment affirming
the Commission's conclusions that Osage violated Rule 8 and Rule 78. See 16 Tex. Admin. Code
§§ 3.8, .78. Osage argues that the Commission erred in its conclusion that Osage violated these rules
because the Commission had no authority to require Osage to obtain a permit in the first instance. 
The crux of Osage's argument is that it was recycling, not disposing of or reclaiming, the drill
cuttings that it received. For the following reasons, we disagree.

 The legislature has charged the Commission with authority to prevent pollution of
surface water or subsurface water from activities associated with the exploration, development,
and production of oil and gas or geothermal resources. See Tex. Nat. Res. Code Ann. § 91.101
(West Supp. 2007); Tex. Water Code Ann. § 26.131(a) (West 2008). Section 91.101 of the natural
resources code authorizes the Commission to adopt and enforce rules and allows the Commission
to issue permits relating to "the discharge, storage, handling, transportation, reclamation, or disposal"
of oil and gas waste or any other substance or material associated with any operation or activity
regulated by the Commission. Tex. Nat. Res. Code Ann. § 91.101. And section 91.1011 of the
natural resources code defines oil and gas waste as "waste that arises out of or incidental to the
drilling for or producing of oil or gas," including, among other things, "salt water, brine, sludge,
drilling mud, and other liquid, semiliquid, or solid waste material." Id. § 91.1011 (West 2001). 
Section 26.131 of the water code also provides that:


 [t]he Railroad Commission of Texas is solely responsible for the control and
disposition of waste and the abatement and prevention of pollution of surface and
subsurface water resulting from . . . activities associated with the exploration,
development, and production of oil or gas or geothermal resources.


Tex. Water Code Ann. § 26.131(a).


 Rule 8 -- Water Protection

 To comply with its legislative mandate to prevent the pollution of surface and
subsurface water, the Commission adopted Rule 8. See 16 Tex. Admin. Code § 3.8. Rule 8 is the
most comprehensive Commission rule relating to water protection. Id. In relevant part, Rule 8
provides that "no person may dispose of any oil and gas wastes by any method without obtaining a
permit to dispose of such wastes." Id. § 3.8(d)(1). Subsection (a)(26) defines the term "oil and gas
wastes" to include:


 [m]aterials to be disposed of or reclaimed which have been generated in connection
with activities associated with the exploration, development and production of oil
and gas or geothermal resources, as those activities are defined in paragraph (30) of
this subsection, and materials to be disposed of or reclaimed which have been
generated in connection with activities associated with the solution mining of brine. 



Id. § 3.8(a)(26). This definition further provides that the term "oil and gas wastes" includes, but is
not limited to, "saltwater, other mineralized water, sludge, spent drilling fluids, cuttings, waste oil,
spent completion fluids, and other liquid, semiliquid, or solid waste material." Id. (emphasis added). 
Rule 8 also defines what it means to dispose of oil and gas wastes:


 To dispose--To engage in any act of disposal subject to regulation by the
commission including, but not limited to, conducting, draining, discharging, emitting,
throwing, releasing, depositing, burying, landfarming, or allowing to seep, or to cause
or allow any such act of disposal.



Id. § 3.8(a)(24).



 Rule 78 -- Fees and Financial Security Requirements

 In addition to Rule 8, the Commission has adopted Rule 78 relating to fees
and financial security requirements for commercial facilities. See 16 Tex. Admin. Code § 3.78. 
Essentially, Rule 78 requires a facility owner or operator to provide financial security for the
estimated closure costs of the facility if the owner or operator "receives compensation from others
for the storage, reclamation, treatment, or disposal of oil field fluids or oil and gas wastes that are
wholly or partially trucked or hauled to the facility and whose primary business is to provide these
services for compensation" if, among other things, the facility is permitted under Rule 8. See id.
§ 3.78(a)(3) (defining "commercial facility"), (l)(1)(A)(I) (requiring estimate of maximum dollar
amount to close facility), (l)(3)(A) (requiring financial security).


 The Evidence

 During the administrative hearing, Rozypal testified that Osage was in the business
of recycling "oil based cuttings" into road base, and he described Osage's recycling process
as follows:


 [W]e take a material or an ingredient that we take off the drilling rigs and we bring
it into our facility. The ingredient is immediately mixed with caliche, which has
calcium and lime, and then we start what is called a pre-process. Then if we wanted
to further enhance the material to make it where it was, say, had better compressive
strengths, depending on the type of road or parking lot that it was going to go on,
then we would enhance it by maybe adding some other chemicals such as an asphalt
emulsion or some cement or lime to improve the compressive strengths and the
stability of the material and kind of depending on the order. Then we would . . . sell
it to different customers.



Osage also provided testimony that, when properly completed, the recycling process used by Osage
would encapsulate the oil based cuttings and allow Osage to sell the resulting product as road base. 
Thus, according to Osage, it was recycling oil based cuttings and was not engaged in the disposal
or reclamation of oil and gas wastes as described in Rule 8 and, therefore, was not required to obtain
a permit.


 The evidence revealed, however, that when Osage transported the oil based cuttings
to the Rozypal Ranch Facility it would discharge the cuttings from a truck and deposit them directly
on the ground, where they would be subject to the elements and potential surface water run-off. 
Osage would then mix the oil based cuttings with caliche and re-deposit and store this "premix
material" on the ground. An April 8, 2003, inspection report prepared by the Commission's district
office showed that Osage had a stockpile of approximately 24,000 cubic yards of waste mixed with
caliche. Subsequent inspection reports dated November 25, 2003, and April 21, 2004, showed that
Osage's premix stockpile of waste and caliche had grown to approximately 27,000 cubic yards. And
another inspection report dated March 16, 2005, showed that Osage had accumulated approximately
62,455 cubic yards of oil based cuttings mixed with caliche in a pile 292 x 385 x 15 high.

 The plain language of Rule 8 defines "oil and gas waste" to include drill cuttings. See
16 Tex. Admin. Code § 3.8(a)(26); see also Railroad Comm'n of Tex., Waste Minimization in the
Oil Field 4-1 (July 2001), available at http://www.rrc.state.tx.us/divisions/og/key-programs/manual/
wastemin.pdf. (3) This definition is consistent with the Commission's enabling act, which defines "oil
and gas waste" as "waste arising out of or incidental to the drilling for or producing of oil or gas,"
including solid waste material. See Tex. Nat. Res. Code Ann. § 91.1011.

 Despite the plain language of these definitions, Osage argues that, because it intended
to recycle the cuttings into road base, the oil based cuttings it receives at the Rozypal Ranch Facility
are not "oil and gas waste" within the meaning of the statute or the Commission's rule. Osage
further argues that its intent is controlling with regard to whether the cuttings are an "oil and gas
waste" or merely an ingredient used in its recycling process. Although the parties agreed that Osage
was operating a legitimate recycling facility, the Commission rejected Osage's argument and
concluded that the cuttings received by Osage did not lose their identity as "oil and gas waste" until
they have been recycled into finished road base within the parameters of the permit issued to Osage. (4) 
As a result, the Commission concluded that Osage was required to obtain a permit and that Osage
violated Rule 8(d)(1) by depositing or discharging oil and gas waste without a permit.

 The Commission's conclusions are supported by the plain language of the statutes it
is charged with enforcing and its rules. See Tex. Nat. Res. Code Ann. §§ 91.101, .1011; Tex. Water
Code Ann. § 26.131; 16 Tex. Admin. Code § 3.8. The legislature has given the Commission broad
powers to prevent water pollution, including the power to issue permits relating to the discharge,
storage, handling, transportation, reclamation, or disposal of oil and gas waste or of any other
substance or material associated with any operation or activity regulated by the Commission. See
Tex. Nat. Res. Code Ann. §§ 91.101, .1011; Tex. Water Code Ann. § 26.131; Lone Star Salt Water
Disposal Co. v. Railroad Comm'n, 800 S.W.2d 924, 927 (Tex. App.--Austin 1990, no writ). Based
on the record before us, we hold that the Commission acted within its authority to require Osage to
obtain a permit for its activities. See Tex. Nat. Res. Code Ann. §§ 91.101, .1011; Tex. Water Code
Ann. § 26.131; 16 Tex. Admin. Code § 3.8.

 Moreover, we find no merit in Osage's argument that as a legitimate recycling
facility it was not subject to Commission rules regulating the disposal of oil and gas waste. The
Commission's enabling act gives the Commission broad discretion to regulate "the discharge,
storage, handling, transportation, reclamation, or disposal of oil and gas waste" to prevent water
pollution. See Tex. Nat. Res. Code Ann. § 91.101(4). As a reviewing court, we are not bound by
the reasons given by the Commission in its final order, so long as there is a valid basis in the record
to support the Commission's action. See Texas Health Facilities Comm'n v. Charter Med.-Dallas,
Inc., 665 S.W.2d 446, 452-53 (Tex. 1984); Railroad Comm'n v. City of Austin, 524 S.W.2d 262, 279 
(Tex. 1975). We may sustain the Commission's action if the evidence is such that reasonable minds
could have reached the conclusion that the Commission must have reached in order to justify its
action. See Suburban Util. Corp. v. Public Util. Comm'n, 652 S.W.2d 358, 364 (Tex. 1983). Even
if we agreed with Osage's argument that it was not engaged in the disposal of oil and gas waste, the
record evidence demonstrates that Osage's activities included, among other activities subject to
Commission regulation, the transportation, storage, handling, and discharge of oil and gas waste. 
See Tex. Nat. Res. Code Ann. § 91.101; 16 Tex. Admin. Code § 3.8. We conclude that this evidence
is such that reasonable minds could have reached the conclusion that the Commission must have
reached in order to justify its determination that Osage was required to obtain a permit. See Charter
Med., 665 S.W.2d at 452-53; Suburban Util. Corp., 652 S.W.2d at 364.

 With regard to Osage's claim that it was not required to file financial security because
it was not required to obtain a permit, we likewise reject that claim. Having concluded that the
Commission properly required Osage to obtain a permit for its activities, we conclude that the
Commission acted within its authority to require Osage to file financial security. See Tex. Nat. Res.
Code Ann. §§ 91.101, .109; Tex. Water Code Ann. § 26.131; 16 Tex. Admin. Code § 3.78. We
overrule Osage's first and second issues.


Permit Violations

 In its third, fourth, and fifth issues, Osage contends that the Commission erred
in concluding that Osage violated the terms of the permit issued by the Commission on June 26,
2003. Although Osage preserved these issues for our review by including them in its motion for
rehearing before the Commission, see Hill v. Board of Trs. of the Ret. Sys. of Tex., 40 S.W.3d 676,
679 (Tex. App.--Austin 2001, no pet.); United Sav. Ass'n v. Vandygriff, 594 S.W.2d 163, 169-70
(Tex. App.--Austin 1980, writ ref'd n.r.e.), we observe as an initial matter that Osage has failed
to properly brief these issues on appeal. See Tex. R. App. P. 38.1(h). Texas Rule of Appellate
Procedure 38.1 provides that a brief to this Court "must contain a clear and concise argument
for the contentions made, with appropriate citations to authorities and to the record." See id.;
McIntyre v. Wilson, 50 S.W.3d 674, 682 (Tex. App.--Dallas 2001, pet. denied). Osage's brief cites
no authority for its claims that the Commission erred in concluding that Osage violated the terms of
its permit. An issue on appeal unsupported by argument or citation to any legal authority presents
nothing for the appellate court to review. See Strange v. Continental Cas. Co., 126 S.W.3d 676, 678
(Tex. App.--Dallas 2004, pet. denied). Accordingly, we conclude that Osage has presented nothing
for our review. See id.

 But even if we were to consider Osage's claims, on this record, we cannot conclude
that the Commission erred in finding that Osage violated the terms of its permit. The record shows
that the Commission issued permit number STF-011 to Osage on June 26, 2003. Under the terms
of this permit, Osage was required to: (1) file semi-annual reports with the Commission; (2) file
financial security with the Commission before receiving oil and gas waste at the Rozypal Ranch
Facility; and (3) refrain from continuing to receive oil and gas waste at the Rozypal Ranch Facility
when the financial security filed by Osage was not the amount of financial security required by Rule
78. As we construe Osage's arguments, Osage contends that it was not required to obtain a permit
and, therefore, cannot be liable for violating the terms of a permit it was not required to obtain. 
Having previously determined that the Commission acted within its authority to require Osage to
obtain a permit, we conclude there is no merit to Osage's claims.

 The record showed that Osage was required to file semiannual reports beginning
six months from the date of the permit. There is no evidence that Osage filed any reports with the
Commission in compliance with the terms of its permit. The record also showed that Osage's permit
included a provision requiring it to file financial security with the Commission prior to receiving oil
and gas waste. Under the terms of its permit, Osage was required to file financial security in the
amount of $508,402.90 based on a closure cost estimate for 10,000 cubic yards of waste. Inspection
reports prepared by the Commission's district office showed that, as of November 25, 2003, Osage
had accumulated a stockpile of 27,000 cubic yards of waste mixed with caliche--well in excess
of the 10,000 cubic yards of waste allowed under the terms of its permit. The record further
demonstrated that Osage did not file financial security with the Commission until August 24, 2004. 
But even after filing its financial security, Osage continued to receive oil and gas waste in excess of
the 10,000 cubic yards specified in its permit. An inspection report dated January 14, 2005, showed
that Osage had stockpiled 48,750 cubic yards of oil and gas waste mixed with caliche. Another
inspection report dated March 16, 2005, disclosed a stockpile of waste mixed with caliche of 62,455
cubic yards, in a pile 292 x 385 x 15 high. We conclude that there is substantial evidence in the
record to support the Commission's conclusions that Osage violated the terms of its permit. We
overrule Osage's third, fourth, and fifth issues.


CONCLUSION


 Because we conclude that the Commission's final order was consistent with
the statutes and rules authorizing the Commission to regulate oil and gas waste and that the
Commission's final order was supported by substantial evidence, we affirm the district court's
judgment affirming the Commission's final order.


 __________________________________________

 Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed: July 24, 2008
1. 16 Tex. Admin. Code §§ 3.8, .78 (2008) (Railroad Comm'n).
2. Drill cuttings are bits of rock and soil cut from subsurface formations by the drill bit during
the process of drilling a well and then lifted to the surface by circulation of oil-based drilling fluids.
3. Commission Statewide Rule 30 also identifies cuttings as "waste materials . . . subject
to the jurisdiction of the [Railroad Commission]." See 16 Tex. Admin. Code § 3.30(e)(1) (2008)
(Memorandum of Understanding Between the Railroad Commission of Texas and the Texas
Commission on Environmental Quality).
4. Federal courts that have considered arguments similar to Osage's have likewise rejected
such arguments. See Owen Elec. Steel Co. v. Browner, 37 F.3d 146, 149-50 (4th Cir. 1994)
(discussing cases and concluding that slag, which lay on the ground for six months for tempering
and weathering, was not used immediately in the steel production process and was, therefore, subject
to EPA permitting requirements under the Resource Conservation and Recovery Act (RCRA),
42 U.S.C.A. §§ 6901-6992k (West 2003 & Supp. 2008)); American Mining Congress v. EPA,
824 F.2d 1177, 1185-86 (D.C. Cir. 1987) (explaining that materials used in ongoing manufacturing
or industry process are not waste). Applying the rationale of these decisions to the circumstances
presented here, the Commission properly determined that the cuttings received by Osage and
stockpiled as "premix material" are waste because they lay on the ground and were not immediately
used in an ongoing manufacturing or oil and gas industry process.